UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X

MAURA E. LYNCH,                                    :
                                                   :
                              Plaintiff,           :
                                                   :    **MEMORANDUM DECISION AND**
                                                   :    **ORDER**
               – against –                         :
                                                   :    15-CV-4630 (AMD) (SIL)
                                                   :
VILLAGE OF SAG HARBOR, SGT. THOMAS                 :
PAGANO, and STEPHEN VACCARO,                       :
                                                   :
                              Defendants.          :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The *pro se* plaintiff brings this action against Sergeant Thomas Pagano, her ex-husband

Stephen Vaccaro, and the Village of Sag Harbor.  She brings claims against Sergeant Pagano

under 42 U.S.C. § 1983 and New York state law for unlawful search and seizure and false arrest

in violation of the Fourth Amendment, selective enforcement in violation of the Fourteenth

Amendment, and state law claims for assault and battery, trespass, false arrest, and wrongful

eviction.  (ECF No. 1 ¶¶ 63–71.)[1]  She brings Fourth Amendment claims for unreasonable

seizure and false arrest, and state law claims for trespass, false arrest, wrongful eviction, abuse of

process, and intentional infliction of emotional distress against Vaccaro.  (*Id.* ¶¶ 77–83.)  Finally,

she asserts that the Village of Sag Harbor is vicariously liable under New York state law for

Pagano's alleged violations of state law.  (*Id.* ¶ 60.)[2]

---

[1] The plaintiff was represented by different lawyers at various points in this case. She has been
representing herself since November 2021.

[2] The Court refers to the Village and Sergeant Pagano collectively as the "Village Defendants."

Before the Court are the defendants' motions for summary judgment.  As explained below, the Court grants summary judgment on the plaintiff's federal claims and declines to exercise supplemental jurisdiction over the plaintiff's state claims.

## BACKGROUND[3]

### I.    Factual Background

Stephen Vaccaro, the plaintiff's ex-husband, brought a divorce action against the plaintiff in New York State court in 2010.  (Vaccaro 56.1 ¶ 1.)  The family court entered a judgment of divorce in July 2013, after a trial, and issued orders regarding the distribution of the marital assets, which included several properties.  (*Id.* ¶¶ 1–2.)[4]  From around 2009 to at least 2015, the plaintiff lived in Sag Harbor, New York.  (Village Defs. 56.1 ¶ 1; Vaccaro 56.1 ¶ 4.)[5]  Sergeant Thomas Pagano worked for the Sag Harbor Village Police Department.  (Village Defs. 56.1 ¶ 3.)

The dispute in this case centers on the property located at 24 Ninevah Place in Sag Harbor, which was part of the marital estate in the divorce action; in order to buy it, the plaintiff had to buy out Vaccaro's fifty percent equity in the property.  (Vaccaro 56.1 ¶ 10.)[6]  The parties

---

[3] The factual background is based on the Court's review of the record, including the parties' briefs, Rule 56.1 statements of fact and counterstatements, and all supporting exhibits, including the transcript of the recordings the plaintiff made of her interactions with Sergeant Pagano on August 14, 15, and 16, 2014. (*See* ECF No. 200-1 (the Village defendants' Rule 56.1 statement with the plaintiff's responses ("Village Defs. 56.1")); ECF No. 200-35 (Vaccaro's Rule 56.1 statement with the plaintiff's responses ("Vaccaro 56.1")); ECF No. 205-1 (the plaintiff's Rule 56.1 statement with the Village defendants' responses ("Pl. 56.1")); ECF No. 195-10, Collected Audio Transcripts from August 14–16, 2014 ("Audio Tr.").)  All citations to these documents incorporate the responses and objections of the opposing party.

[4] Vaccaro makes assertions about other properties in his Rule 56.1 Statement of Facts, (*see e.g.* Vaccaro 56.1 ¶¶ 5–9, 11), most of which the plaintiff disputes.  These disputes are not relevant to the Court's decision in this case.

[5] The plaintiff now lives in Wainscott, New York.  (Village Defs. 56.1 ¶ 1.)

[6] The plaintiff and Vaccaro dispute whether they lived at the property while they were married.  According to Vaccaro, the property was an investment property that the plaintiff managed, and neither party was living there when the trial order was issued.  (Vaccaro 56.1 ¶ 4.)  The plaintiff says that she

dispute when this payment was due, and whether the plaintiff ever bought out Vaccaro's interest. (*Id.*)

On August 14, 2014, Vaccaro reported to the Sag Harbor Police Department that the plaintiff was trespassing at the Ninevah Place property. (Village Defs. 56.1 ¶ 5.)[7] Pagano received a radio call about the trespass, and he and Officer Justin Solof went to investigate. (*Id.* ¶ 6.)[8] Pagano told the plaintiff, who was outside the house, that Vaccaro claimed he had an order excluding the plaintiff from the property. (*Id.* ¶ 7.) [9] The plaintiff replied that she would go back into the house until Vaccaro arrived with the order. (*Id.*) The plaintiff's brother, Michael Lynch, was also at the house. (*Id.*) Pagano said that he or her brother would let her know when Vaccaro returned with the order. (*Id.*) Pagano told her that "nobody's getting arrested" unless he "actually [saw] something that says [the plaintiff] . . . cannot be in . . . [the property], and if she's there, she is to be arrested." (Audio Tr. at 4, 7.) Pagano also said, "It's all civil. I don't see anything that says trespass." (*Id.* at 7.)

When Vaccaro returned to the property, he showed Pagano the following court order issued by New York Supreme Court Judge Carol Mackenzie, dated November 26, 2013:

> ORDERED that [Vaccaro's] application to find [the plaintiff] in contempt is GRANTED as she has . . . admittedly failed to buy out [Vaccaro's] share of 24 Ninevah (December 12, 2012, March 15, 2013 and May 3, 2013 orders), admittedly has failed to split (50/50

---

[7] began living at the property months before Vaccaro initiated the divorce action, and lived there "for a significant period during the divorce litigation." (*Id.*)

[7] The parties dispute whether Vaccaro went to the police station or called 911. (Village Defs. 56.1 ¶ 5.)

[8] The plaintiff recorded portions of her interactions with the officers. The recording reflects that the plaintiff and Pagano knew each other fairly well. They called each other by their first names, and referred to their past interactions, including about the plaintiff's divorce, and her earlier complaints about Vaccaro. (*See, e.g.,* Audio Tr. at 4, 6, 59.)

[9] At some point, Vaccaro was parked outside of the house. (Audio Tr. at 4–5.) At various points during this encounter, Pagano went back and forth between Vaccaro and the plaintiff. (Village Defs. 56.1 ¶ 19; ECF No. 195-5, New York General Municipal Law § 50-H Hearing Transcript ("50-H Tr.") at 55:16-19.)

> by anyone's standards) the rental proceeds received for 24 Ninevah . . . (May 3, 2013 order) . . .
>
> ORDERED that [Vaccaro's] application to exclude [the plaintiff] from 24 Ninevah is GRANTED and is effective in 30 days from the date of this order should [the plaintiff] fail to pay [Vaccaro] for his interest in said property by said date as per this Court's prior order dated May 3, 2013, which directed [the plaintiff] to pay said monies 90 days from the date of that order and expired July 31, 2013. Since then, [the plaintiff] has only rented said property for her own gain and defied orders to provide monies to [Vaccaro] while he still has an interest in same; and it is
>
> ORDERED, that the Suffolk County Sheriff is directed to assist [Vaccaro] in the exclusion of [the plaintiff] from 24 Ninevah in accordance with this order.

(ECF No. 195-12, November 26, 2013 Court Order ("Nov. 26, 2013 order") at 5–6; *see also* Audio Tr. at 14.)[10] Pagano reviewed the order and spoke with Vaccaro's counsel, Thomas Campagna, over the phone. (Village Defs. 56.1 ¶ 9.) Based on the order and his conversation with Campagna, Pagano believed that the order excluded the plaintiff from the property, and that she was not permitted to be there. (Village Defs. 56.1 ¶¶ 9, 13.)

The exchange about the court order and its significance went on for some time, during which the plaintiff insisted the order did not bar her from being on the property. Pagano told the plaintiff that the court order "[said] to exclude [her] from 24 Ninevah." (Audio Tr. at 14; *see also* Village Defs. 56.1 ¶ 14.)[11] The plaintiff responded that it was "not an Order ordering [her]

---

[10] In his 56.1 statement of facts, Vaccaro described events and orders that predate the November 26, 2013 order, which the plaintiff disputes. (*See, e.g.*, Vaccaro 56.1 ¶¶ 5–15.) These disputes are about other properties and are not material to the issues before the Court. The plaintiff also disputes the details of the May 3, 2013 order, in which Judge McKenzie found that the plaintiff breached in the November 26, 2013 order. (Vaccaro 56.1 ¶¶ 13–14.) The Court relies on the order, not the parties' description of it. (*See* ECF No. 195-16, Orders From Related Proceedings ("Related Orders") at 2–4.)

[11] The plaintiff says that she disputes almost all the Village defendants' assertions about the events of August 14, 2014, (*see generally* Village Defs. 56.1), but frequently does not address the specific factual assertion she purports to dispute. The plaintiff makes other claims that are not supported by the record. *See McDermott v. This Dog's Life Corp.*, No. 23-CV-5869, 2025 WL 3096448, at *15 (S.D.N.Y. Oct. 28, 2025) ("[T]he record evidence does not show a dispute of fact."); *Williams v. Chuttey*, No. 15-CV-1278, 2018 WL 1413049, at *1 (N.D.N.Y. Mar. 21, 2018) ("[N]otwithstanding the fact that the court

out of the house." (Village Defs. 56.1 ¶ 13.)  Rather, she claimed, it was "conditional" and she "fulfilled the condition" when she "bought [Vaccaro] out."  (Audio Tr. at 14; *see also* Village Defs. 56.1 ¶ 15.)  Pagano asked, "What if [Vaccaro] says you didn't?"  (Audio Tr. at 15.)  The plaintiff answered that Vaccaro would have gotten a "writ of assistance from the sheriff to have her excluded" from the property if she had not fulfilled the condition.  (*Id*.)  The plaintiff insisted that there was no court order "saying for the sheriff to exclude [her]."  (*Id*. at 17.)  At that point, Pagano asked if the plaintiff had proof that she met the conditions of the order.  (*Id*. at 18.)  The plaintiff replied that her attorney had it, so Pagano suggested that they "go back to the police station" and she could "[c]all [her] attorney."  (*Id*.)  The plaintiff refused to go because her children were with her, and it was after 5:00 p.m.  (*Id*.)

Then, the plaintiff claimed that even if she did not have documentary proof to support her claim that she bought Vaccaro out, the November 26, 2013 court order was "conditional," and there was "no writ of assistance from the sheriff."  (*Id*. at 24–25.)  Thus, she maintained, Vaccaro did not have "proof that [she had] officially been excluded from this house."  (*Id*. at 25.)  In an effort to explain that she satisfied the "conditions" of the order,  the plaintiff said that the money she owed Vaccaro was "canceled out:" the "buy-out on [the property] was 91," she had "a court order saying [Vaccaro] owed [her] $72,000," and Vaccaro "owed [her] $5,000 of other money . . . and $13,000 of other money."  (*Id*. at 26.)  She "applied the money that [Vaccaro] owed [her] to the money [she] owed [Vaccaro]" so they are "at ground zero and it's done."  (*Id*. at 26–27.)[12]

---

must draw all inferences and resolve all ambiguities in his favor, [the plaintiff's] arguments involve disputes that are not genuine."), *aff'd,* 767 F. App'x 105 (2d Cir. 2019).  Thus, the Court relies primarily on the audio recordings from that date, which the parties cite to support their versions of the events.

[12] The plaintiff testified at the Section 50-H hearing that she never paid Vacarro any money, "because after applying the credits towards the equity in the property, [Vacarro] actually owed [the plaintiff]

Pagano asked whether the plaintiff had "proof that says this." (*Id.* at 27.) The plaintiff repeated that if she had not met the "conditions" of the November 26, 2013 court order, Vaccaro would have gotten a writ of assistance from the sheriff; he did not do that, which the plaintiff claimed showed that she fulfilled the conditions. (*Id.* at 27–28.)[13] Pagano responded that he was "not a lawyer," something he said more than once. (*Id.* at 28.)

Pagano told the plaintiff that Vaccaro was "adamant about wanting you arrested," but Pagano "was trying to talk him out of it." (*Id.* at 30.) The plaintiff said she was "just as adamant about having [Vaccaro] arrested." (*Id.*) She also said she would call her lawyer if Pagano planned to take her to the police station. (*Id.*) Panago responded, "Let's do that" to "nip this in the bud." (*Id.* at 31.) The plaintiff maintained that nothing would be resolved, because Vaccaro did not have a court order, a "writ of assistance from the sheriff," a "10-day notice to evict," or a "valid receivership order." (*Id.* at 31–32.) When Pagano once again asked the plaintiff for "proof," she said that Vaccaro had a letter that described that the plaintiff cancelled out the money she and Vaccaro owed to each other. (*Id.* at 32.) Pagano responded that Vaccaro denied getting a letter. (*Id.*)

At this point, the plaintiff said, "All right. You know what? Stay right here one second. I'll show you the letter that he -- stay right here. Do not go back there. I don't want my kids seeing you." (*Id.*) Pagano responded, "Don't tell me what to do," and that her children's welfare

---

money. So it wouldn't make any sense that [the plaintiff] would pay [Vacarro] when [Vacarro] still owed her money." (50-H Tr. at 53:20–54:2.)

[13] The plaintiff and Pagano also argued about a contempt finding against the plaintiff, although it is not clear if they were talking about the November 26, 2013 court order, or a different order. Pagano asked, "Why are you in contempt of court?" The plaintiff responded, "This has nothing to do with that," and that the "order was stayed by the Appellate division . . . because the judge was wrong." (Audio Tr. at 28–29; *see also* Village Defs. 56.1 ¶¶ 20, 24.)

was his "number one concern." (*Id.* at 33.)  When the plaintiff started into the house, Pagano

told her to "come outside." (*Id.* at 33–34; *see also* Village Defs. 56.1 ¶¶ 24–25.)

The plaintiff and the Village defendants dispute what happened next.  According to the

plaintiff, Pagano "resorted to physical force and grabbed [her] arm." (Village Defs. 56.1 ¶ 25.)

The Village defendants, on the other hand, say that Pagano "place[d] his hand upon her left arm

to prevent her from entering the house." (*Id.* ¶ 27.)[14]  The plaintiff also says that Pagano and

Solof "had both their hands on her pinning her back to the side of the house." (*Id.*)  Once they

"took their hands off" her, they were still "standing in front of [her] with the house to the back of

[her]" so she felt like she "was still restrained." (Lynch Dep. at 128:2-8.)  The transcript of the

recording reflects that the plaintiff told Pagano to "[g]et your hands off me," and that Pagano

asked the plaintiff to listen to him. (Audio Tr. at 34–35.)  When Pagano asked if the plaintiff's

brother could get the letter, the plaintiff said, "He doesn't know where it is." (*Id.* 34.)  The

plaintiff asked Pagano to "take [his] hands off [her]" a few more times. (*Id.* at 34–35.)  Pagano

said, "Well, come with me.  You can contact your attorney at the police station." (*Id.* at 35; *see

also Village* Defs. 56.1 ¶ 24.)

The plaintiff called for her brother, who came outside, asked what was happening, and

repeatedly told the plaintiff to "calm down." (Audio Tr. at 35–36.)  The plaintiff said that she

was "just trying to get [her] proof" and that Pagano was "not letting" her get her "proof." (*Id.* at

36.)  She told Pagano to let her go "right now," that she had "PTSD," and that Pagano was

"freaking [her] out right now." (*Id.*)  The plaintiff's brother asked Pagano to "step back." (*Id.* at

37.)  The Village defendants say that Pagano stepped back; the plaintiff concedes that Pagano

---

[14] The plaintiff testified at her deposition that Pagano held her arm for no more than five minutes.  (ECF No. 195-6, Maura Lynch Deposition Transcript ("Lynch Dep."), at 118:8-14.)

released her, but says that Pagano "refused to back away" so she was "still confined . . . with the house to her back and Pagano directly in front of her." (Village Defs. 56.1 ¶ 29.)

Pagano and the plaintiff's brother continued to urge her to "calm down." (Audio Tr. at 38.) Pagano told the plaintiff that she could not go into the house, but asked her brother to "[t]ry to get that piece of paper." (*Id.* at 37; *see also* Village Defs. 56.1 ¶ 29.) The plaintiff told Pagano to "back out of [her] personal space." (Audio Tr. at 38.) Pagano responded that he was not "backing out," and the brother told Pagano to "[j]ust give her a little breathing room." (*Id.*; *see also* Village Defs. 56.1 ¶ 29.) Pagano again asked the plaintiff to "tell [her brother] where this paper is." (Audio Tr. at 38.) The plaintiff asked why Vaccaro could get "whatever proof he needed," but she was "not allowed to walk into [her] house to get proof." (*Id.*)[15]

Pagano asked the plaintiff to go to the police station and said he did not want the plaintiff's children to see what was happening. (*Id.* at 44.) The plaintiff responded, "Then get the fuck away from my door." (*Id.* at 44–45.) The plaintiff and Pagano eventually agreed that she would go with him to the police station once she got her "proof." (*Id.* at 45.) The plaintiff said she was going to call her attorney, Edward Burke, to which Pagano replied, "You can call him. Good." (*Id.*)[16] She went into the house, and Pagano and Solof went with her. (*Id.* at 46–48; Village Defs. 56.1 ¶¶ 31–32.)[17]

The plaintiff retrieved some documents and called her attorney. (Audio Tr. at 54; Village Defs. 56.1 ¶ 33.) She also asked Pagano to call her attorney, but Pagano said he wanted to speak

---

[15] The transcript reflects that the plaintiff was extremely upset. She repeatedly ordered Pagano to stay away from her, and not to come near the house. Her brother, Pagano, and Solof continued to urge her to "calm down," and "relax." (Audio Tr. at 36.) At one point, in demanding that Pagano not come into the house, she said, "This is the last time I'm going to ask you, Tom." (*Id.* at 47.) When Pagano asked her to listen to him, the plaintiff said, "You know what? Fuck you." (*Id.*)

[16] Pagano appeared to know the plaintiff's lawyer, to whom he referred as "Eddie." (*Id.* at 55.)

[17] The plaintiff told them not to follow her. (*Id.* at 46–48; Village Defs. 56.1 ¶¶ 31–32.)

to the lawyer at the police station, possibly in person.  (Audio Tr. at 55.)  The plaintiff said her brother would watch the children and that Vaccaro should stay away from the house while she was at the police station.  (*Id.* at 55–56.)

At that point, Vaccaro ran across the yard.  (Village Defs. 56.1 ¶ 33.)  Pagano yelled at him to "wait," and the plaintiff repeatedly screamed "no."  (Audio Tr. at 56; Village Defs. 56.1 ¶ 33.)  The plaintiff then refused to leave the house, claiming that Vaccaro might steal things.  (Audio Tr. at 56–58.)  She told Pagano that she "committed no crime" and did not have to go with him.  (*Id.* at 57.)  Pagano responded that he "believe[d] there's a possible criminal trespass." (*Id.*)

The plaintiff gave Pagano a letter and gave Solof her attorney's phone number.  (*Id.* at 57, 60.)  Solof tried calling the lawyer but got his voicemail.  (*Id.* at 60.)  Pagano looked at the letter, which was "just a letter from your lawyer," not a court order, like the November 26, 2013 order.  (*Id.* at 61–63; Village Defs. 56.1 ¶ 34.)  The plaintiff claimed that the letter proved that she bought Vaccaro's share of the property.  (Audio Tr. at 61.)  In addition, the plaintiff said, she was the only listed owner on the title, and there was a "notice of trespass" on file at the Sag Harbor Village Police Department stating that Vaccaro was not allowed on the property.[18]  (*Id.* at 66.)  Once again, Pagano suggested that they go to the police station and have the plaintiff's lawyer meet them there.  (*Id.* at 66–67.)  Once again, the plaintiff claimed that that Vaccaro would steal things from the house if she was not there.  (*Id.*)  Pagano told the plaintiff that she was "not spending the night in jail."  (*Id.* at 68; Village Defs. 56.1 ¶ 34.)

The plaintiff and her brother told Pagano to tell Vaccaro to get off the property.  (Audio Tr. at 69.)  Pagano responded, "The thing is he wants you off the property."  (*Id.*)  Pagano

---

[18] When Pagano told the plaintiff that notice of trespass had expired, she said, "Then I want another one." (Audio Tr. at 83.)

repeated that the plaintiff's letter was "from one attorney to the other," not "an order or anything." (*Id.*; Village Defs. 56.1 ¶ 34.) The plaintiff then showed Pagano a court order which she said showed that Vaccaro "tried to be appointed receiver of this property . . . and the judge crossed it out;" this showed, according to the plaintiff, that Vaccaro had "no legal rights to this property whatsoever." (Audio Tr. at 71; Village Defs. 56.1 ¶ 34.)[19] The plaintiff said that if Pagano took anyone down to the station, it should be Vaccaro, not the plaintiff. (Audio Tr. at 72.)

Pagano and the plaintiff continued to argue about whether the plaintiff would come to the station. (*Id.* at 74–79.) Pagano spoke with the plaintiff's attorney over the phone, and told the plaintiff that her attorney would meet them at the police station. (*Id.* at 77; Village Defs. 56.1 ¶ 41.) Pagano was "asking [her] nicely" to come with him, but said that he would charge her with criminal trespass, because "per court order [she is] not allowed on the property." (Audio Tr. at 79.) He clarified that she was "not under arrest right now." (*Id.*) The plaintiff asked "how much more proof" Pagano needed. (*Id.* at 85.)

The plaintiff ultimately agreed to go to the police station, and drove her car there. (Village Defs. 56.1 ¶ 35.) The officers drove separately. (*Id.* ¶ 40.) The Village defendants assert that the officers never arrested the plaintiff, while she maintains that Pagano and Solof "had her pinned up against the side of the house," which "was an arrest to [her]." (*Id.* ¶ 36.) The

---

[19] The following language from the May 20, 2014 order is crossed out: "ORDERED that [Vaccaro] is authorized in his capacity as Receiver for the property located at 24 Ninevah Place, Sag Harbor to enter into a contract of sale and to close said contract of sale and otherwise fulfill all obligations thereunder." (ECF No. 200-16, May 20, 2014 Order.) Similarly, references to Vaccaro as receiver of the property are crossed out. (*Id.*) The plaintiff also gave Solof a transcript from a March 14, 2014 hearing at which the family court said that the plaintiff was not ordered out of the house. (Village Defs. 56.1 ¶ 34; *see also* Audio Tr. at 80–81.) The plaintiff also filed two nonconsecutive transcript pages, in which the plaintiff said that she "was never ordered out of that property," and the family court responded, "That's correct." (*See* ECF No. 200-19, Excerpt of March 14, 2014 Transcript at 4.)

plaintiff contends that Pagano "threatened" to handcuff her, but concedes that he did not do so, and also concedes that she was not injured. (*Id.* ¶¶ 37–38.) The plaintiff's lawyer met with her and Pagano at the station. (*Id.* ¶ 42.) The plaintiff left the police station and drove back to the Ninevah Place house. (*Id.*)

Vaccaro was at the house when the plaintiff returned. (*Id.* ¶ 43.) Pagano, who had also arrived, told him that the plaintiff was going to stay in the house that night and would bring the children to him in the morning. (Audio Tr. at 97.) Pagano also explained that the plaintiff "was not arrested," and that the matter was "all civil." (*Id.* at 97–98; *see also* Village Defs. 56.1 ¶ 43.) Pagano directed Vaccaro to follow him back to the police station, and said that he would "take all the information" and "write down what you want me to write down, and then [the plaintiff] can take it to court." (Audio Tr. at 98; *see also* Village Defs. 56.1 ¶ 43.) Pagano then told the plaintiff that she could "go." (Audio Tr. at 98; Village Defs. 56.1 ¶ 52.) The entire encounter lasted about three hours. (Village Defs. 56.1 ¶ 45; Lynch Dep. at 156:12-24.)

The plaintiff, her children, and her brother spent the night at the house. (Village Defs. 56.1 ¶ 44.) Pagano issued an incident report, dated August 14, 2014 at 8:26 p.m., in which he described the "incident type" as "Civil: Possible Criminal Trespass." (ECF No. 195-11, August 14, 2014 Police Report.) He wrote that that Vaccaro reported that the plaintiff was trespassing on the property in violation of a "supreme court order" which directed the Suffolk County Sheriff "to assist [Vaccaro] in the exclusion of [the plaintiff] from 24 Ninevah Place." (*Id.*) Finally, Pagano wrote that he advised Vaccaro to get an amended order. (*Id.*)

On August 15, 2014, Vaccaro filed a notice of trespass against the plaintiff. (ECF No. 195-13, Notice of Trespass dated August 15, 2014 ("Notice of Trespass"); *see also* Village Defs.

11

56.1 ¶ 53.)[20]  Pagano saw the plaintiff the same day, when she dropped the children at Vaccaro's house, and warned her that she could be arrested for trespass if she returned to the Ninevah property.  (Village Defs. 56.1 ¶ 53; ECF No. 195-8, Thomas Pagano Deposition Transcript ("Pagano Dep.") at 157:15–158:12.)  The parties dispute whether Pagano gave the plaintiff a copy of the notice of trespass then or the next day.  (Village Defs. 56.1 ¶ 53.)[21]

On August 16, 2014, the plaintiff and her friend met Pagano at the police station, where they continued to argue about whether the plaintiff met the "condition" of the November 26, 2013 order.  (Audio Tr. at 111–12.)  Pagano told the plaintiff that she would be arrested if she went to the property again.  (Id. at 134.)  The Village defendants assert that the only "proof" the plaintiff submitted was her lawyer's letter.  (Village Defs. 56.1 ¶ 54.)  The plaintiff claims that she gave Pagano the following documents: the March 4, 2014 transcript excerpt reflecting that at that point, the family court had not excluded her from the property, and the May 20, 2014 order purportedly denying Vaccaro's request for possession of the property.  (Id.)  Pagano told the plaintiff to "go back to the Court" or "the sheriff's office" to get "an order saying that you are allowed back in the house."  (Audio Tr. at 159; Village Defs. 56.1 ¶ 55.)  The plaintiff did not return to the Ninevah property between August 16th and August 22nd.  (Village Defs. 56.1 ¶¶ 46–47.)

---

[20] The plaintiff claims that Vaccaro might not have executed the notice of trespass on August 15th, citing Vaccaro's deposition testimony that the signature "could be [his]" and that he did not believe he asked Pagano "to execute a Notice of Trespass."  (Village Defs. 56.1 ¶ 53.)  This testimony does not raise a factual question about when Vaccaro executed the notice; the notice itself, which includes Vaccaro's name, bears the date of August 15, 2014.  (See Notice of Trespass.)

[21] The audio transcripts suggest that Pagano gave the plaintiff a copy of the notice on August 16, 2014.  At one point during their conversation, the plaintiff she said she "need[ed] a copy of the notice of trespass that [Vaccaro] executed."  (Audio Tr. at 136.)  Pagano responded, "I can give you a copy of that notice of trespass."  (Id.)  Regardless, the day on which Pagano gave the plaintiff the notice is not material.

## II.    Subsequent Proceedings

On April 1, 2015, Judge McKenzie appointed a third party as receiver of the Ninevah

Place property and found the plaintiff in contempt of the November 26, 2013 order, concluding

that she had "not vacated the property located at 24 Ninevah Place, Sag Harbor as directed."

(Related Orders at 17–18.)  The plaintiff filed for bankruptcy on November 9, 2015.  (Village

Defs. 56.1 ¶ 67.)  As part of those proceedings, United States Bankruptcy Judge Alan S. Trust

denied the plaintiff's claim of a homestead exemption for the property on June 13, 2019.

(Related Orders at 21.)

The plaintiff appealed Judge Trust's orders to District Judge Gary R. Brown, who denied

the appeals on May 20, 2022.  *See In re Lynch,* No. 19-CV-3837, 2022 WL 1606000, at *1

(E.D.N.Y. May 20, 2022).[22]  Judge Brown described the factual history:

> On November 26, 2013, Lynch was found to be in contempt of
> court for, *inter alia,* failing to purchase Vaccaro's share of the Sag
> Harbor property and her failure to pay Vaccaro half the rental
> proceeds. As Lynch did not purchase Vaccaro's share of the Sag
> Harbor property, the contempt order provided that the appellant
> was to be excluded from the Sag Harbor property.  Nonetheless, in
> or about August 2014, Lynch broke into the Sag Harbor property,
> changed the locks, and broke in a second time after Vaccaro had
> the locks changed back. In April 2015, the state court held Lynch
> in contempt of court once again.

*Id.* (internal citations omitted).  Judge Brown also addressed the plaintiff's argument "that her

'possessory rights in the Ninevah property were never terminated by the State Court and she was

in complete lawful possession and occupancy' because '[o]n April 1, 2015, when the State Court

made a final determination on Vaccaro's request to have Debtor evicted, this relief was denied,

and no Writ of Assistance was issued.'"  *Id.* at *7.  According to Judge Brown, "[i]t is

---

[22] The Court "may properly take judicial notice of the decisions to the extent that they establish that such decisions were rendered," but not "to establish the truth of any matter asserted in the decisions." *Elliott v. Nestle Waters N. Am. Inc.*, No. 13-CV-6331, 2014 WL 1795297, at *8 (S.D.N.Y. May 6, 2014).

undisputed that the matrimonial court found Lynch in contempt of court for 'not vacat[ing] the property located at 24 Ninevah Place, Sag Harbor . . . .'" *Id.* Judge Brown also affirmed the Bankruptcy Court's factual findings that:

> The State Court's May 3, 2013 order granted Vaccaro's request to exclude Debtor from Ninevah if she failed to pay Vaccaro for his interest by July 31, 2013, which she did not do. Thus, the State Court ordered the Suffolk County Sheriff to assist the Plaintiff there, Vaccaro, in the exclusion of the Defendant, there the Debtor, from Ninevah.
> . . .
> The April 1, 2015 order of the State Court found the Debtor in contempt of its November 26, 2013 order, and provided that the Debtor has not vacated the Ninevah property, and thus has disobeyed a lawful judicial order expressing unequivocal mandate.
> . . .
> So, while there is no question that the Debtor was actually physically occupying Ninevah at the time of the bankruptcy petition, that occupancy was not under claim of right, but was in fact, determined by the State Court to be unlawful, as in violation of various orders of the State Court that clearly excluded the Debtor from occupying the Ninevah property.

(*Id.*)

## III.    Procedural History

The plaintiff brought this action against Pagano, Vaccaro, and the Village of Sag Harbor on August 7, 2015.  (ECF No. 1.)  She alleged that Pagano and Vaccaro violated her federal constitutional rights and New York state law, and that the Village of Sag Harbor is vicariously liable for Pagano's violations of her state law rights.  (*Id.*)  The defendants answered the complaint on October 30, 2015.  (ECF Nos. 15, 16.)  Throughout the almost ten years that followed, the parties participated in mediation and a settlement conference, and completed discovery after the Court granted extensions of time.  On April 4, 2025, the defendants moved for summary judgment (ECF Nos. 194, 195), and the plaintiff opposed the motions on May 30, 2025 (ECF No. 200).

14

## LEGAL STANDARD

Summary judgment is appropriate if the parties' submissions — including pleadings, deposition transcripts, affidavits, and other material in the record — show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material if it 'might affect the outcome of the suit under the governing law,'" and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant has the burden of demonstrating that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020) (citation omitted).

A court "may find for the moving party 'only if [it] conclude[s] that on the record presented, considered in the light most favorable to the non-moving party, no reasonable fact-finder could find in its favor.'" *Roberts v. Genting N.Y. LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (citation modified) (quoting *Capobianco v. City of N.Y.*, 422 F.3d 47, 54–55 (2d Cir. 2005)). A court does not consider whether "the evidence unmistakably favors one side or the other but whether a fair-minded fact-finder could return a verdict for the non-moving party on the evidence presented." *Id.* (citation modified) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

# DISCUSSION

## I.     Federal Claims

### a.  Claims Against Pagano

The plaintiff brought five federal claims against Pagano:

- Counts One and Seven: Unreasonable seizure for "physically restraining" her at the property on August 14, 2014 and for "threatening [her] with arrest and compelling her to vacate her house on August 15, 2014" (ECF No. 1 ¶¶ 63, 69);

- Count Three: Unlawful search for entering the house on August 14, 2014 (*id.* ¶ 65);

- Count Five: False arrest "for threatening [her] with arrest and compelling her to go to the police station on August 14, 2014" (*id.* ¶ 67); and

- Count Nine: Selective enforcement for "siding with [] Vaccaro over [her] in the parties' state court property dispute and using his official position and authority to injure [her] and assist [] Vaccaro in unlawfully obtaining possession of the property" (*id.* ¶ 71).[23]

The Village defendants argue that they are entitled to summary judgment, because the plaintiff has not proven the claims.  (ECF No. 196.)  In any event, they say that Pagano is entitled to qualified immunity.  (*Id.*)

### i.  False Arrest

"To prevail on a claim for false arrest, a plaintiff must plead that '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the

---

[23] The plaintiff brought only one claim against the Village of Sag Harbor — for vicarious liability pursuant to the doctrine of respondeat superior.  (ECF No. 1 ¶¶ 60–61.)  That claim is related to the state law claims against Pagano, not her federal claims.

plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Othman v. City of New York*, No. 13-CV-4771, 2018 WL 1701930, at *10 (E.D.N.Y. Mar. 31, 2018) (quoting *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted).

"The existence of probable cause to arrest . . . 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Russell v. The J. News*, 672 F. App'x 76, 80 (2d Cir. 2016) (summary order) (quoting *Weyant*, 101 F.3d at 852). "Even without probable cause to arrest, 'an arresting officer [is] entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest.'" *Id.* (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *Escalera*, 361 F.3d at 743). "The test for qualified immunity is 'more favorable to the officers than the one for probable cause.'" *Id.* (quoting *Escalera*, 361 F.3d at 743).

The plaintiff asserts different theories of false arrest. In the complaint, she bases her false arrest claim on Pagano's "threat[ ]" to arrest her, and that he "compell[ed] her to go to the police

station on August 14, 2014." (ECF No. 1 ¶ 67.)  However, in her counterstatement of facts, she argues that Pagano and Solof arrested her when they "restrained [her] and had her pinned up against the side of the house."  (Village Defs. 56.1 ¶ 36.)

The Village defendants assert that Pagano did not arrest her, and that she went voluntarily to the police station "in her own vehicle," and was "not arrested, apprehended, handcuffed, or transported by Pagano to the Sag Harbor Village Police Department."  (*Id.* ¶ 35.)  The plaintiff admits that she "agreed and went in her own vehicle" and that "Pagano did not put handcuffs on her," but claims that she "did not believe she had any choice and was not free to say no" and that Pagano "threatened to handcuff" her.  (*Id.* ¶¶ 35, 37.)  The Village defendants also dispute the level of physical force that Pagano used; they argue that Pagano "place[d] his hand upon her left arm to prevent her from entering the house."  (*Id.* ¶ 27.)

To start, the plaintiff's argument that Pagano arrested her when he tried to prevent her from going into the house is not persuasive.  Pagano had a report, backed up by what appeared to be a court order, that the plaintiff was trespassing.  Keeping her out of the property on which she was accused of trespassing does not amount to an arrest.  Nor did he arrest her when he persuaded her to go to the police station.  She drove herself, was not handcuffed, and met her lawyer at the station.

Even giving the plaintiff every benefit of the doubt, and assuming that Pagano arrested her when he tried to keep her from going into the house, or when he convinced her to go to the police station, it is clear that Pagano had probable cause to arrest the plaintiff for trespassing.  He had a report from an identified complainant — Vaccaro — and a court order excluding the plaintiff from the property.  (*See* Nov. 26, 2013 Order.)  Pagano also spoke with Vaccaro's lawyer.  (Village Defs. 56.1 ¶ 9.)  To be sure, the plaintiff tried to convince Pagano that her

18

version of events was correct.  She insisted that that the order was "conditional," that she fulfilled the "condition" through a convoluted "cancelling out" process, and that Vacarro needed a writ of assistance to have her excluded from the property.  (Audio Tr. at 24–25.)  At one point, she gave the officers two pages from a transcript, and an order that she claimed denied Vacarro possession of the property.  (Village Defs. 56.1 ¶ 34; Audio Tr. at 71, 80–81.)

"[A] law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness . . . unless the circumstances raise doubt as to the person's veracity."  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (citation modified).  The Second Circuit has "found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee."  *Wieder v. City of N.Y.*, 569 F. App'x 28, 29–30 (2d Cir. 2014) (quoting *Curley v. Vill. of Suffern,* 268 F.3d 65, 70 (2d Cir. 2001)).  "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."  *Id*. at 29 (quoting *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 128 (2d Cir. 1997)).  Officers "are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence."  *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir. 1989).

An identified citizen informant — Vacarro — reported that the plaintiff was trespassing on his property.  That claim was supported by a court order that appeared to exclude the plaintiff from the property.  At that point, Pagano had probable cause to arrest the plaintiff for trespass. Nevertheless, he listened to the plaintiff's claims, apparently for hours, read her documents, suggested that the plaintiff get an amended order from the court, and spoke to her lawyer.  As he advised the plaintiff, he was "not a lawyer," (Audio Tr. at 28), and it was not his job to determine

who was ultimately right; he had to decide whether there was probable cause to arrest her for trespass. *See Wilson v. City of New York*, No. 18-CV-7301, 2020 WL 5709200, at *4 (E.D.N.Y. Sept. 24, 2020) ("[T]he officer made a reasonable decision to apprehend [the person] suspected of wrongdoing even if he did not have enough information to make a final determination of guilt by weighing the evidence, and even though he was presented with different stories from an alleged victim and the arrestee." (citations modified)). In short, Pagano had information "sufficient to warrant a person of reasonable caution in the belief that [the plaintiff] . . . [was] committing a crime." *Russell*, 672 F. App'x at 80 (quoting *Weyant*, 101 F.3d at 852).[24]

For these reasons, the Court grants the Village defendants' motion as to the plaintiff's Section 1983 false arrest claim.

### ii.   Unreasonable Search

"The Fourth Amendment's warrant requirement protects one's privacy interest in home or property." *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000). "Absent exigent circumstances or some other exception, the police must obtain a warrant before they enter the home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." *Id.* Because "Fourth Amendment privacy interests are most secure when an individual is at home with doors closed and curtains drawn tight, . . . searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 51 (citation omitted). However, a "Fourth Amendment search does *not* occur — even when the explicitly protected location of a house is concerned — unless the individual manifested a subjective expectation of privacy in the object of the challenged search, and society [is] willing to recognize that expectation as

---

[24] Even if Pagano did not have probable cause — and he clearly did — he would have had "arguable probable cause," because it was objectively reasonable for him to believe that probable cause existed. *See Russell*, 672 F. App'x at 80 (quoting *Escalera*, 361 F.3d at 743). Thus, he would have been entitled to qualified immunity.

reasonable." *Palmieri v. Lynch*, 392 F.3d 73, 81 (2d Cir. 2004) (quoting *Kyllo v. United States*, 533 U.S. 27, 33 (2001)); *see also Gori*, 230 F.3d at 50 ("Absent a reasonable expectation of privacy . . . the warrant requirement is inapplicable and the legitimacy of challenged police conduct is tested solely by the Fourth Amendment's requirement that any search or seizure be reasonable.").

The plaintiff alleges that Pagano unlawfully searched her property when he followed her into the house on August 14, 2014.  (ECF No. 1 ¶ 65.)  The plaintiff had a subjective expectation of privacy because she thought she had a right to be at the property, was there with her children and brother when Pagano arrived, and told Pagano to stay outside.  *See, e.g.*, *Palmieri*, 392 F.3d at 81 ("[B]y erecting a fence, posting a 'No Trespassing' sign, and writing letters indicating his refusal to consent to a search of his property, Palmieri 'clearly exhibit[ed] a legitimate . . . subjective expectation of privacy.'").  The question is whether the plaintiff had an objectively reasonable expectation of privacy.  The Village defendants argue that the plaintiff did not have an objectively reasonable expectation of privacy and cannot make an unlawful search claim, because she was trespassing.  (ECF No. 196 at 20–22.)

"By explicitly stating that 'a mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully,' the Second Circuit indicated that an unlawful occupant's subjective expectation of privacy is not one that 'society is prepared to accept as objectively reasonable.'"  *Wilson v. Sessoms-Newton*, No. 14-CV-00106, 2017 WL 3575240, at *5 (E.D.N.Y. Aug. 17, 2017) (citations omitted).  "Courts in this Circuit therefore frequently reject Fourth Amendment . . . claims by trespassers or squatters."  *Sheppard v. Leuze*, No. 21-CV-2075, 2024 WL 3566981, at *8 (E.D.N.Y. July 29, 2024) (quoting *Murphy v. County of Chemung*, No. 18-CV-6628, 2024 WL 3228056, at *13 (W.D.N.Y. June 28, 2024)).

21

The plaintiff did not have an objectively reasonable expectation of privacy, because she was not lawfully occupying the house in August 2014. In the May 3, 2013 order, the family court found that the plaintiff "chose the property located at 24 Ninevah Place," but "without having provided any monies to [Vaccaro] for his interest in said property, [she] has listed the property for rent." (Related Orders at 2–4.) The family court ordered the plaintiff to "forward to [Vaccaro] his share [of any rental income] upon receipt of said rental monies." (*Id.* at 4.) On November 26, 2013, the family court found the plaintiff in contempt of the May 3, 2013 order, and other court orders, for "fail[ing] to split . . . the rental proceeds received for 24 Ninevah" and "fail[ing] to buy out [Vaccaro's] share of 24 Ninevah." (Nov. 26, 2013 Order at 5.) The family court granted Vaccaro's request to "exclude [the plaintiff] from 24 Ninevah," and the exclusion was "effective in 30 days from the date of this order should [the plaintiff] fail to pay [Vaccaro] for his interest in said property." (*Id.* at 6.) The order also directed the Suffolk County Sheriff "to assist [Vaccaro] in the exclusion of [the plaintiff] from 24 Ninevah in accordance with this order." (*Id.*) That order was in effect when Pagano went to the property on August 14, 2014, almost nine months after the family court judge issued the order.

As explained above, the plaintiff claimed that the order was "conditional," that she "fulfilled the condition," and that the order did not exclude her from the property. (Audio Tr. at 14–26.) She did not supply any valid support for her claim; she had only a letter from her attorney to Vaccaro's attorney, two nonconsecutive pages from a transcript, and a different order, none of which supported her claim that she bought the property.[25] On the contrary, the family court held the plaintiff in contempt of the November 26, 2013 order.

---

[25] The plaintiff also argues that her "possession of the house was always legal by virtue of the deed in her name." (Village Defs. 56.1 ¶ 55.) But the deed was recorded in 2008, six years before the divorce. (*See* ECF No. 200-18, Deed for 24 Ninevah Place.) The family court divided the marital properties as part of the divorce.

> [The plaintiff] has not vacated the property located at 24 Ninevah Place, Sag Harbor as directed, and thus, disobeyed 'a lawful judicial order expressing an unequivocal mandate' of which she had knowledge . . . Further, [Vaccaro] has demonstrated that [the plaintiff's] offending conduct was calculated to or actually did defeat, impair, impede, or prejudice his rights in that he has been unable to effectuate a sale of the property.

(Related Orders at 18 (citations omitted).)  Clearly, the plaintiff was not permitted to be at the property on August 14, 2014, and she was violating a court order by being there.  Based on this record, no reasonable jury could find that the plaintiff was a legal tenant with an objectively reasonable expectation of privacy.  *Wilson*, 2017 WL 3575240, at *6; *see also United States v. Alford*, 764 F. Supp. 3d 191, 229–30 (M.D. Pa. 2025) ("A defendant residing in his home after a court-ordered eviction, or after his license to reside in there is revoked under state law, is effectively a trespasser retaining no expectation of privacy."); *Washington v. St. Albans Police Dep't*, 30 F. Supp. 2d 455, 458 (D. Vt. 1998) (finding that the plaintiff did not have a reasonable expectation of privacy within an apartment, because his "presence within the apartment . . . was in direct violation of" a family court order directing him to stay away from the apartment").[26]

---

[26] Even if the plaintiff did have a reasonable expectation of privacy at the house, and Pagano searched it merely by coming inside, Pagano would be entitled to qualified immunity.  "Qualified immunity shields government officials from claims for money damages unless a plaintiff adduces facts showing that '(1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct.'"  *Sheppard*, 2024 WL 3566981, at *10 (quoting *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019)).  "In short, if at least some reasonable officers in the defendant's position could have believed that the challenged conduct was within the bounds of appropriate police responses, the defendant officer is entitled to qualified immunity." *Id.* (quoting *Mara*, 921 F.3d at 69). "Even if an officer is mistaken . . . the officer will not be held liable if he acted reasonably and in good faith." *Id.* (quoting *Washpon v. Parr*, 561 F. Supp. 2d 394, 403 (S.D.N.Y. 2008)).  As explained above, Pagano reasonably believed that the plaintiff was trespassing on the property because Vaccaro reported it and because of the November 26, 2013 court order.  Pagano also acted reasonably.  He permitted the plaintiff to go into the house, even though he thought she was trespassing, let her retrieve documents, and continued listening to her arguments.  (Audio Tr. at 54–55; Village Defs. 56.1 ¶ 33.)  *See Sheppard*, 2024 WL 3566981, at *12 ("This Court finds that the police officers undertook a good faith investigation of the circumstances . . . and that based on the facts they knew, made the reasonable determination that Plaintiff did not live at and was not permitted . . . to stay at the property.").

23

For these reasons, the Court grants the Village defendants' motion for summary judgment on the plaintiff's Section 1983 unreasonable search claim.

     *iii.   Unreasonable Seizure*

The Fourth Amendment protects the rights of people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement, 'through means intentionally applied.'" *Forbes v. City of Rochester*, 612 F. Supp. 3d 159, 168–69 (W.D.N.Y. 2020) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). The plaintiff makes two claims for unreasonable seizure against Pagano: that he "physically restrain[ed]" her at the property on August 14, 2014 and when he "threaten[ed] [her] with arrest and compell[ed] her to vacate her house on August 15, 2014." (ECF No. 1 ¶¶ 63, 69.)

The plaintiff says that Pagano "physically restrain[ed]" her on August 14, 2014, (ECF No. 1 ¶ 63), which the Court interprets to be an excessive force claim, although the plaintiff did not plead it as such. "The Fourth Amendment's protection against unreasonable seizures prohibits the use of excessive force by police officers in arresting suspects." *Forbes*, 612 F. Supp. 3d at 167. "To establish a Fourth Amendment excessive force claim, the Plaintiff must show that the force used by the officer was 'objectively unreasonable.'" *Id.* (quoting *Correa v. McLeod*, No. 17-CV-1059, 2017 WL 2962884, at *3 (D. Conn. July 11, 2017)). "Determining whether the force is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the governmental interests at stake." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

24

"A court shall consider 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the [arrestee] poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). "'Not every push or shove' amounts to a Fourth Amendment violation." *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012) (quoting *Graham,* 490 U.S. at 396). "Indeed, a 'de minimus [sic] use of force will rarely suffice to state a Constitutional claim.'" *Id.* (quoting *Romano v. Howarth,* 998 F.2d 101 105 (2d Cir. 2005)). "Further, a plaintiff must allege that he sustained an injury to maintain an excessive force claim." *Id.* However, "[s]uch injury need not be severe." *Id.*

No reasonable jury could find that Pagano's actions on August 14, 2014 were objectively unreasonable. As explained above, Pagano had probable cause to believe that the plaintiff was trespassing at the property, and the record reflects that Pagano responded reasonably to the situation he confronted. Even accepting the plaintiff's argument that Pagano "resorted to force" and "had her pinned up against the side of the house," (Village Defs. 56.1 ¶¶ 25, 36), Pagano believed that the plaintiff was trespassing, and could not permit her to go into the house unaccompanied. The plaintiff concedes that she was not injured, and that Pagano held her arm for less than five minutes. (Village Defs. 56.1 ¶ 38; Lynch Dep. at 118:8-14.) The plaintiff disputes that Pagano warned her not to go in the house, but Pagano told the plaintiff to "come outside" when she first tried to go inside. He also suggested that her brother could get whatever she wanted for her. (Audio Tr. at 33–34; *see also* Village Defs. 56.1 ¶¶ 24–25.) The transcript reflects that Pagano, who knew the plaintiff, tried repeatedly to calm the situation (as did the plaintiff's brother), and to persuade her to sort the matter out, with her lawyer, at the police station, not at the property on which she was trespassing. (*See, e.g.*, Audio Tr. at 66–67.)

Nor could a reasonable jury find that Pagano seized the plaintiff the next day, let alone that it was unreasonable. The parties agree that Pagano warned the plaintiff on August 15, 2014 that she could be arrested for trespassing if she returned to the property. (Village Defs. 56.1 ¶ 53; Pagano Dep. at 157:15–158:12.) Pagano did not use "physical force or show of authority" to "terminate[] or restrain[] [the plaintiff's] freedom of movement." *Forbes*, 612 F. Supp. 3d at 168 (quoting *Brendlin*, 551 U.S. at 254). Accordingly, the Court grants the Village defendants' motion as to the plaintiff's Section 1983 unreasonable seizure claims.

### iv. Selective Enforcement

"To establish an equal protection violation based on a claim of selective enforcement, plaintiff must show '(1) that [she was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Anderson v. City of New York*, 817 F. Supp. 2d 77, 94 (E.D.N.Y. 2011) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)). Although the "similarly situated" prong is generally "a factual issue that should be submitted to the jury . . . a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790–91 (2d Cir. 2007) (quoting *Harlen Assocs.*, 273 F.3d at 499 n.2).

The Village defendants argue that Vaccaro was not similarly situated to the plaintiff because he had a court order, and the plaintiff did not have a "superseding or counter order." (ECF No. 196 at 25.) In addition, the Village defendants maintain that there is no evidence that Pagano acted with "bad faith intent to injure" the plaintiff. (*Id.*) The plaintiff argues that she and Vaccaro were similarly situated because she filed a notice of trespass against Vaccaro, but

"Pagano did nothing" when "Vaccaro violated the Notice of Trespass right in front of Pagano," by coming into the yard before Pagano and the plaintiff went to the police station, and returning while Pagano and the plaintiff were at the police station.  (ECF No. 200 at 13.)  The plaintiff argues that she provided Pagano with "proof," but he "disregarded" what she gave him and "demanded more."  (*Id.*)  She asserts that "Pagano did not make similar demands of Vaccaro" and that "he willfully accepted Vaccaro's interpretation of the November 26, 2013 order."  (*Id.*)

Summary judgement is appropriate for this claim.  The plaintiff and Vaccaro were not similarly situated because, as explained above, the November 26, 2013 order established that Vaccaro could exclude the plaintiff if she did not buy out his interest in the property.  (*See* Nov. 26, 2013 Order.)  Nor does the record establish that the plaintiff had a valid trespass claim against Vacarro, as she claims.  (*See* Audio Tr. at 83.)  The plaintiff conceded as much when Pagano told her that she had an expired notice; she responded that she wanted "another one," confirming that there was no current notice of trespass in effect on August 14, 2014.  (*Id.*)[27]

Moreover, no rational jury could find that Pagano treated her differently because of a "malicious or bad faith intent to injure" her.  *Anderson*, 817 F. Supp. at 94 (quoting *Harlen Assocs,* 273 F.3d at 499).  Pagano was investigating Vaccaro's trespass claim, as explained above.  He listened to her, permitted her to retrieve the documents she said supported her story, reviewed the documents, and spoke to her lawyer.  (*See* Audio Tr. at 54–77.)  He did not handcuff her, permitted her to drive herself to the police station, and escorted her back to the house, where he explained to Vaccaro that she would be staying at the house that night.  (Village Defs. 56.1 ¶¶ 35, 40; Audio Tr. at 97.)  Nothing about this encounter suggests bad faith or an

---

[27] The plaintiff claims that she filed a copy of a September 9, 2013 notice of trespass with her opposition brief (ECF No. 201 ¶ 15), but the document she filed is the notice of trespass that Vaccaro executed against the plaintiff on August 15, 2014 (*see* ECF No. 201-1).

27

intent to injure the plaintiff.  For these reasons, the Court grants the Village defendants' motion as to the plaintiff's Section 1983 selective enforcement claim.

### b. Claims Against Vaccaro

The plaintiff makes two federal claims against Vaccaro:

- Count Ten: false arrest "in connection with [] Pagano's threatening Ms. Lynch with arrest and compelling her to go to the police station on August 14, 2014" (ECF No. 1 ¶ 77); and

- Count Thirteen: unreasonable seizure "in connection with [] Pagano's threatening Ms. Lynch with arrest and compelling her to vacate her house on August 15, 2014" (*Id.* ¶ 80).

Vaccaro argues that he is entitled to summary judgment on each of these claims because he is not a state actor as required for Section 1983 liability.  (ECF No. 194-12 at 5–6.)

The Court has already found that Pagano did not violate the plaintiff's rights.  Thus, even if Vaccaro were a state actor, there was no constitutional violation.  In any event, no reasonable juror could find that Vaccaro was a state actor.  Vaccaro reported to Pagano that the plaintiff was trespassing on the property.  Even if that information was false, providing false information or information that "results in the officers taking affirmative action," does not "constitute joint action with state actors."  *Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 371 (E.D.N.Y. 2015).  The plaintiff cites no evidence that Vaccaro was "directing" Pagano to take any particular action.  *Id.*  On the contrary, Pagano was acting as a mediator between the plaintiff and Vaccaro.  For example, Vaccaro was "adamant about wanting [the plaintiff] arrested," and Pagano "[tried] to talk [Vaccaro] out of it."  (Audio Tr. at 30.)  He also told Vaccaro that the matter was "civil" and the plaintiff "was not arrested."  (*Id.* at 97–98.)  Moreover, Pagano apparently worked out

some kind of agreement that permitted the plaintiff to stay at the Ninevah Place house, even though she had no right to be there, and communicated that to Vaccaro. (*Id.*) There is no support for the plaintiff's claim that Vaccaro and Pagano agreed that Pagano would "ambush[]" her on August 15, 2014, when she dropped off her children at Vaccaro's house." (ECF No. 200-34 at 4.) Not only is there no evidence of an agreement, there is no evidence that Pagano "ambushed" her or did anything unconstitutional. He merely warned her that she should not go back to the Ninevah Place property.[28]

For these reasons, Vaccaro is entitled to summary judgment on the plaintiff's Section 1983 false arrest and unreasonable seizure claims.

## II.     State Claims

Under 28 U.S.C. § 1367(a), federal courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." However, a "district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). "Courts deciding whether to exercise supplemental jurisdiction must balance the so-called *Gibbs* factors outlined by the Supreme Court in *United States v. Gibbs*, 383 U.S. 715, 726 (1966)." *Eisenhauer v. Culinary Inst. of Am.*, No. 19-CV-10933, 2024 WL 1833601, at *2 (S.D.N.Y. Apr. 26, 2024). "Those factors include the values of judicial economy, convenience, fairness, and comity." *Id.* (citation modified).

---

[28] There is no merit to the plaintiff's claim that Vaccaro was a state actor because he "represented he was a state court appointed receiver." (ECF No. 200-34 at 3.) Vaccaro was not acting as a receiver when he reported the trespass to Pagano.

The Court has dismissed all the federal claims over which it has original jurisdiction, and the *Gibbs* factors point toward declining to exercise supplemental jurisdiction. Because discovery is complete, "little additional preparation will be required in state court before refiling summary judgment motions on [] purely state law issue[s]." *Id.* at *3. Thus, judicial economy and convenience weigh in favor of declining jurisdiction. Fairness also weighs in favor of declining jurisdiction, because the parties will not be prejudiced by the delay. *See Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) ("We are not persuaded by Pitchell's argument that he is being prejudiced by the delay resulting from the necessary pursuit of his state-law claims in state court. As already stated, there is little, if any, dispute as to the facts, and little additional pretrial preparation will be required in state court."). The final factor, comity, "reflects a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways." *Eisenhauer*, 2024 WL 1833601, at *3 (quoting *Levin v. Com. Energy Inc.*, 560 U.S. 413, 421 (2010)). Here, New York state courts are best suited to adjudicate the remaining issues of state law. Ultimately, "[t]he Supreme Court has instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of [these] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* at 2 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Thus, the Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state law claims for assault and battery, trespass, false arrest, and wrongful eviction against Pagano, and for trespass, false arrest, wrongful eviction, abuse of process, and intentional

infliction of emotional distress against Vaccaro, as well as for her state law claim against the Village of Sag Harbor.

## CONCLUSION

For these reasons, the defendants' motions are granted with respect to the plaintiff's federal claims, and the Court declines to exercise supplemental jurisdiction over the plaintiff's state claims.  This action is dismissed.


**SO ORDERED.**

_____s/Ann M. Donnelly_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
       February 10, 2026